**MICHIGAN CONSOLIDATED GAS COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 12069.

United States Court of Appeals Third Circuit.

Argued May 10, 1957.

Decided July 16, 1957.

Charles V. Shannon, Washington, D. C. (Stanley M. Morley and May, Shannon & Morley, Washington, D. C., and John Dern and Sidley, Austin, Burgess & Smith, Chicago, Ill., on the brief), for petitioner.

Raymond N. Shibley, Washington, D. C. (William E. Miller and Steptoe & Johnson, Washington, D. C., on the brief), for Panhandle Eastern, intervenor.

Edward Burling, Jr., Washington, D. C. (Jerome Ackerman, Washington, D. C., Covington & Burling, Washington, D. C., on the brief), for Union Gas Co. of Canada, intervenor.

Howard E. Wahrenbrock, Solicitor, Washington, D. C. (Willard W. Gatchell, General Counsel, and Edwin M. Miller, Attorney, Washington, D. C., on the brief), for Federal Power Commission.

Gerald K. O'Brien, Pros. Atty., Leonard Simons, County Utilities Counsel, and David R. Kaplan, Sp. Asst. Pros. Atty., Detroit, Mich., on the brief, for County of Wayne, amicus curiae.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

MARIS, Circuit Judge.

This is a proceeding to review portions of an order of the Federal Power Commission issued June 30, 1956 pursuant to its opinion No. 292.[1] The petitioner for review, Michigan Consolidated Gas Company, asks this court to set aside paragraphs (H) and (I) of the order[2]

[1.] 15 F.P.C. 46.

[2.] "(H) Panhandle is hereby authorized, subject to the conditions specified herein, to export natural gas from the United States into the Dominion of Canada for sale and delivery to its present customer Union Gas Company of Canada, as hereinabove described and as more fully set forth in its application in Docket No. G-2475.

"(I) The authorization to export natural gas granted under paragraph (H) hereof is subject to the following terms and conditions:

"(i) Panhandle shall make, keep, and preserve full and complete records with respect to the natural gas herein authorized to be exported, and shall file with the Commission annual reports showing, by months, the quantities of gas exported during the preceding calendar year, together with the volumes exported on the peak day of each month and such other reports with respect to such exportation as the Commission may deem necessary and in such form and manner as the Commission may prescribe.

"(ii) The authorization hereby granted may be modified from time to time or terminated, after opportunity for hearing, upon further order of the Commission, but in no event shall such authorization extend beyond termination of the Presidential Permit relating to this authorization.

"(iii) This authorization to export natural gas to Canada shall not be transferred in any manner whatsoever, but such authorization shall continue in effect for a reasonable time in the event of involuntary transfer of the facilities used thereunder by operation of law (including transfers to receivers, trustees, or purchasers under foreclosure or judicial sale) pending the making of an application for permanent authorization and decision thereon, provided notice is promptly given in writing to the Commission accompanied by a verified statement that the facts relating to sufficiency of supply, rates, and nature of use remain substantially the same as before the transfer.

"(iv) This authorization shall be effective only so long as Panhandle complies

which authorized Panhandle Eastern Pipe Line Company to export natural gas for sale to Union Gas Company of Canada and to remand to the Commission for modification paragraph (B) of the order[3] under which certain conditions were attached to a certificate of public convenience and necessity issued to Panhandle. The proceedings resulted from the filing of a series of applications by Panhandle and its affiliate, Trunkline Gas Company, both of which are natural gas companies, for certificates of public convenience and necessity under section 7(c) of the Natural Gas Act[4] authorizing the proposed expansion of the natural gas facilities of the Panhandle system and the allocation of the resulting increased volumes of gas among its customers. Panhandle also sought an order under section 3 of the Act[5] permitting the export of additional[6] volumes of natural gas to Union Gas Company of Canada. The proceedings also involved various other companies, communities, commissions and organizations either seeking service from the Panhandle system or intervening in opposition thereto.

Panhandle owns and operates an integrated natural gas pipe line system which extends from its sources of supply in the Hugoton and Panhandle fields in Texas, Oklahoma and Kansas through the states of Missouri, Illinois, Indiana and Ohio to northern termini in Michigan. By means of its expansion program Panhandle proposed to increase the peak-day deliverability of its system by 455,000 Mcf of natural gas, thereby increasing its peak-day capacity from an estimated 970,000 Mcf per day to an estimated 1,425,000 Mcf per day.[7] This expansion was to be accomplished by the installation of additional loop and lateral pipe lines and compressors and by the development of a natural gas storage field near Waverly, Illinois. In connection with this expansion program Panhandle entered into agreements with its customers, not including Michigan Consolidated, for increased deliveries of natural gas. Subsequently, Panhandle amended its application by eliminating therefrom the proposed additional compressor facilities and the proposed development of the storage project at Waverly Field, substituting instead additional expansion of its main line and compressor capacity plus additional facilities for its subsidiary, Trunkline. While this change somewhat reduced the additional peak-day capacity which Panhandle sought to obtain from its expansion program from 455,000 Mcf to approximately 260,000 Mcf it actually increased the enlargement effected by

with the conditions of this order and continues the operations hereby authorized in accordance with the Natural Gas Act and all pertinent rules, regulations, or orders heretofore or hereafter issued by the Commission.

"(v) Panhandle shall, within thirty (30) days of the issuance of this order, file an application to amend the Presidential Permit under which it is presently making existing export deliveries to Union Gas Company of Canada, to conform to the authorizations herein granted."

3. "(B) As conditions attached to the exercise of the rights granted to Panhandle by paragraph (A) above:

"(i) Panhandle shall serve its resale customers with volumes of gas equal to the winter contract demands approved by the Commission in Appendix A of its order of October 5, 1955, as corrected, during the winter months, unless modified in accordance with the provisions of the Natural Gas Act, and the Commission's Rules and Regulations; and Panhandle shall serve, under the S–1 Rate Schedule, the volumes of storage gas which it proposes to sell to Michigan Gas Storage Co. and The East Ohio Gas Co.

"(ii) The facilities being authorized shall not be used for the transportation or sale of natural gas to any new customer except upon specific authorization of the Commission."

4. 15 U.S.C.A. § 717f(c).

5. 15 U.S.C.A. § 717b.

6. Since 1946 Panhandle has been exporting to Union Gas Company of Canada upon an interruptible off-peak basis 5,500,000 Mcf of natural gas per year under authority from the Commission. 5 F.P.C. 472.

7. This phase of the program was proposed in Panhandle's application filed on May 18, 1954, F.P.C. Docket No. G–2433.

the program in the annual capacity of the system. During the course of the consolidated proceedings, as Panhandle's capacity was increased and became operable the Commission issued temporary permits authorizing increases in deliveries to existing customers in the United States until a total increased delivery of upwards of 260,000 Mcf per day was authorized. In the meanwhile, Panhandle renegotiated its contracts with its customers, reducing the amounts of peak-day deliveries originally agreed upon when Panhandle had proposed to enlarge its capacity by 455,000 Mcf per day.

In July, 1954, Panhandle filed its application [8] for authority to export 15,-500,000 Mcf of natural gas per year for 20 years to the Union Gas Company of Canada, pursuant to a contract with that company dated April 21, 1954, for the purchase of the gas by it on an interruptible basis for storage and resale for domestic, commercial and industrial processing uses in various communities in southwestern Ontario. The contract provided for the delivery to Union of annual volumes of natural gas, in addition to 5,500,000 Mcf which had been authorized by the Commission in 1946, amounting to 10,500,000 Mcf in the first year, with annual increases of 1,000,000 Mcf in each year thereafter until a maximum of 15,500,000 Mcf would be reached during the last 15 years of the contract. The price agreed upon was 35¢ per Mcf, or 120% of Panhandle's regulated price to general service customers in Michigan, whichever is higher. Approximately two-thirds of the annual volume of gas purchased under the contract would be delivered during the seven summer months, April through October. The remainder would be delivered during the five winter months. Panhandle would be obligated to deliver during the summer months not less than 92% of the scheduled volume of gas, during the winter months not less than 88% of the scheduled volume, and on an annual basis not less than 90% of the annual volume. The Commission's approval of the export to Union in Canada of this increased volume of gas is the core of the controversy in this case.

Union is engaged in the storage, transportation and distribution of natural gas in the city of Windsor and other communities in southwestern Ontario. It produces a portion of its gas requirements from its own wells in Ontario and purchases the remainder from local producers and Panhandle. It operates a large storage field and takes gas from Panhandle on an interruptible basis, receiving no firm or peak-day deliveries. Union's principal purpose in negotiating the new contract with Panhandle was to make natural gas available to the Hamilton, Ontario, market. Since 1946 Panhandle has been authorized to sell and export to Union in Canada, pursuant to a contract of November 25, 1944 with Union, 5,500,000 Mcf of natural gas annually during the summer months. The Commission's authorization for the export of this gas given by order issued April 23, 1946 was made subject to the condition that at all times persons and municipalities in the United States should receive preferential service.[9]

The petitioner, Michigan Consolidated Gas Company, is a public utility engaged in the purchase, production, storage, transportation, distribution and sale of natural gas in Michigan. It purchases from Panhandle 125,000 Mcf of natural gas per day at Detroit and 2,000 Mcf per day at Ann Arbor and obtains the balance of its natural gas requirements from two affiliated pipe line suppliers, Michigan-Wisconsin Pipe Line Company and American Louisiana Pipe Line Company, in the American Natural Gas Company system.

All the proceedings which arose out of the applications for certificates, together with the export application, were consolidated for hearing by the Commission's presiding examiner. Michigan

8. F.P.C. Docket No. G–2475.

9. Panhandle Eastern Pipe Line Company, 5 F.P.C. 472, 475.

Consolidated intervened in opposition to Panhandle's export application and in the certificate proceedings. The presiding examiner rendered his decision on March 6, 1956. The Commission heard argument on exceptions thereto by Michigan Consolidated. Its opinion No. 292 and accompanying order were issued on June 30, 1956 approving Panhandle's application to export the requested additional volumes of natural gas to Union and authorizing the certificates of public convenience and necessity as requested by Panhandle and Trunkline.[10] An application for rehearing by Michigan Consolidated was denied on August 26, 1956. This petition for review of the Commission's order followed.[11]

██ In considering Michigan Consolidated's attack upon the order here under review we must bear in mind at the outset that the findings of the Commission as to the facts, if supported by substantial evidence, are conclusive.[12] It is a well settled rule that so long as there is warrant in the record for the judgment of the expert body, it must stand.[13] This principle, which this court reiterated in Michigan Consol. Gas Co. v. Federal Power Comm., 3 Cir., 1953, 203 F.2d 895, is applicable here. In the case just cited we said (203 F.2d at page 900):

"* * * The problem of the allocation of service to various customers is one which calls for judgment within the Commission's peculiar and expert competence. Judicial review of the Commission's orders with respect to this question is, we think, limited by the rule as to the review of rate orders laid down by the Supreme Court in Federal Power Comm. v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037, as follows:

"'Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.'"

We must also keep in mind the fact that the gas proposed to be exported to Union is off-peak gas largely for storage, the delivery of which will be interruptible on days of heavy and peak demand on the Panhandle system. Its export, therefore, will not reduce in any way the amount of gas which Panhandle will have available to meet the winter peakday requirements of its firm-demand customers, but will enable Panhandle to employ on off-peak days some of its peak-day capacity which would otherwise be idle.

With these considerations in mind we turn to the specific arguments which Michigan Consolidated advances in support of its contentions that the Commission erred in the order under review in granting Panhandle authority by paragraphs (H) and (I) to export additional

---

10. 15 F.P.C. 46.

11. The County of Wayne, Michigan, which includes Detroit, is wholly supplied by Michigan Consolidated. The county was granted leave to file a brief amicus curiae in support of Michigan Consolidated's objections to the order. Panhandle and Union have intervened in support of the Commission's order.

12. Section 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b).

13. Mississippi Valley Barge Line Co. v. United States, 1934, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260; Rochester Tel. Corp. v. United States, 1939, 307 U.S. 125, 145–146, 59 S.Ct. 754, 83 L.Ed. 1147; Federal Power Comm. v. Hope Natural Gas Co., 1944, 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333; I. C. C. v. Jersey City, 1944, 322 U.S. 503, 513, 64 S.Ct. 1129, 88 L.Ed. 1420.

gas to Union in Canada and in failing in paragraph (B) to impose conditions upon Panhandle's certificate of public convenience and necessity that instead of exporting gas to Canada it should store the gas in its Howell field for the use of its United States customers and in any event should offer the gas to Michigan Consolidated on its interruptible rate schedule I–1 before exporting any of it to Canada.

Michigan Consolidated first argues that the Commission exceeded its authority under section 3 of the Act[14] in authorizing the export of this gas to Union because it is needed in the United States and will impair Panhandle's ability to render adequate service to its local customers. This court has said in Manufacturers Light & Heat Co. v. Federal Power Comm., 3 Cir., 1953, 206 F.2d 404, 407, that "What constitutes impairment of a natural-gas company's ability to render adequate service to its customers is not defined in the Act. Congress, therefore, committed to the Commission the determination, by application of its informed judgment upon the pertinent facts and circumstances presented by each case, whether such an impairment would result." Aside from this, however, there is no support in the record for the premise upon which Michigan Consolidated bases its contention. It relies on a statement by the presiding examiner that Panhandle's peak-day customers desire 187,200 Mcf per day more than Panhandle can supply. This finding rested upon the fact that Panhandle's original expansion program was based on estimates of its firm-demand customers for the use of 455,000 additional Mcf of natural gas on peak-days. When Panhandle reduced its expansion program the quantities of natural gas which would have been available to its firm-demand customers were also reduced. On the basis of this fact, Michigan Consolidated argues that Panhandle's service to its customers would be impaired by the export of the gas to United. The conclusion thus sought to be drawn is a complete non sequitur, however, for the reason already pointed out that Panhandle's customers require peak-day volumes of gas whereas the gas to be exported to Union is non-peak interruptible gas which would be of no use to them. The Commission gave consideration to the fact that Panhandle's contract with Union did not contemplate peak-period deliveries but specifically provided for interruptions, and that Panhandle might curtail deliveries at any time, subject only to meeting seasonal requirements. We conclude that Michigan Consolidated has failed to show that the Commission erred in finding that Panhandle's service to its United States customers will not be threatened by the export of this interruptible gas to Union in Canada.[15]

Michigan Consolidated proposed an alternate plan which it here urges should have been accepted by the Commission. Its proposal was that Panhandle's Howell field in Michigan should be developed by Panhandle for storage

---

14. This section, in pertinent part provides: " * * * The Commission shall issue such order upon application, unless, after opportunity for hearing, it finds that the proposed exportation or importation will not be consistent with the public interest. The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate, and may from time to time, after opportunity for hearing, and for good cause shown, make such supplemental order in the premises as it may find necessary or appropriate." 15 U.S.C.A. § 717b.

15. The Commission, in denying Michigan Consolidated's application for rehearing stated: "None of Panhandle's other customers has expressed any of the fears voiced by Michigan Consolidated of the possibility of impairment of service, and we cannot assume that the export authorization would endanger Panhandle's service to them. On the contrary, the facts respecting Panhandle's service to its existing domestic customers convince us that no such threat exists."

could be utilized for delivery to firm-of this interruptible gas which then demand customers on peak days. In considering this proposal it must be remembered in the first place that Michigan Consolidated has made no demand for this gas for itself on a firm basis. Nor did any of the other customers of Panhandle, whose "need" Michigan Consolidated so strongly champions here, raise their voices in demand for this gas. And in the second place, the Commission found that material evidence in respect to the availability of the Howell field as a gas storage field was lacking in respect to geological matters, operational cost items and other factors which would be necessary to consider in determining whether or not this field should be thus developed. Michigan Consolidated argues that the Commission was under an obligation to secure this evidence and could have obtained it by requiring Panhandle to show cause why it should not develop the Howell field instead of exporting the gas to Canada. The most that can be said for this argument is that it is novel. In view of the lack of power of the Commission to require a natural gas company to enlarge its transportation facilities [16] the authority of the Commission to order the development of such a project is more than doubtful. However this may be, the burden of ascertaining the feasibility of an alternative proposal offered by an opposing party in a proceeding before the Commission is certainly not upon the Commission.

■ Another objection raised by Michigan Consolidated is that the Commission in this case will by its order impair service to domestic customers of Panhandle because in this order it has deviated from its prior policy in respect to the conditions to be attached to an ex-

port authorization. It argues that the 1946 export order was conditioned upon preferential service being given to United States customers. The record, however, shows that the Commission carefully considered this matter, stating:

"We find, however, that as in certain other cases involving the exportation of gas, the public interest requires the imposition of a condition to this export authorization, providing that the authorization herein granted may be modified from time to time or terminated, after opportunity for hearing, upon further order of the Commission. This authorization shall not extend beyond the date of termination of the Presidential Permit relating to this exportation of gas."

As we have seen, the Commission so provided in subparagraph (I) (ii) of the order under review. The terms of the condition were discretionary with the Commission and no abuse of discretion has been shown requiring modification of those terms.

■ Michigan Consolidated also urges, in opposition to the export order, that Panhandle in another proceeding seeks to curtail service to Michigan Consolidated on the basis of unsatisfied demands of its peak-day customers. There is a long history of controversy between these two companies.[17] If the past is any indication this question will one day come before a court of appeals for determination. But it is not here today on the present record and we do not consider it.

■ Michigan Consolidated's next point is that the export order should not have been issued because it desires this interruptible gas for itself and the Commission should, therefore, have required Panhandle under section 7(e) of the

16. Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 3 Cir., 1953, 204 F.2d 675.

17. See, e. g., Panhandle Eastern Pipe Line Co. v. Michigan Public Service Comm., 1951, 341 U.S. 329, 71 S.Ct. 777, 95 L.

Ed. 993; Michigan Consol. Gas Co. v. Panhandle Eastern Pipe L. Co., 6 Cir., 1949, 173 F.2d 784; Michigan Consol. Gas Co. v. Federal Power Comm., 3 Cir., 1953, 203 F.2d 895; Panhandle Eastern Pipe L. Co. v. Federal Power Comm., 3 Cir., 1956, 236 F.2d 289.

Act,[18] as a condition to the issuance of its certificate of public convenience and necessity, to offer 100,000 Mcf of gas per day to it under Panhandle's interruptible rate schedule I-1. The pertinent parts of this schedule are set out in a footnote.[19]

It will be observed that schedule I-1 applies only to gas "in excess of that necessary to meet the firm, annual, and interruptible contract volumes, which Seller has been authorized to deliver in specific dockets." Panhandle has been authorized by the order under review to deliver the interruptible gas in question to Union. The point which Michigan Consolidated here seeks to make therefore necessarily turns upon whether it has carried its burden of showing that the Commission exceeded its authority under section 3 of the Act in finding as it did that the export of the gas to Union is "consistent with the public interest,"[20]

and in authorizing the export upon the basis of that finding. Reduced to its essentials, Michigan Consolidated's position is that under the provisions of Section 3 of the Act it was not consistent with the public interest for the Commission to take the action authorizing the export of Panhandle's gas to Canada since such action will prevent Michigan Consolidated from exercising its right to purchase this gas and that Panhandle's interruptible rate schedule I-1 requires that Michigan Consolidated should have been allowed to purchase the gas in question instead. The Commission carefully analyzed the evidence and found that Michigan Consolidated had not demonstrated that it had adequate or satisfactory markets for the gas. It concluded that it could not, on the record before it, authorize the sale of the gas to Michigan Consolidated and that the mere fact that Michigan Consolidated desired the gas did not make

18. 15 U.S.C.A. § 717f(e).

19. "1. Availability
"This rate schedule is available to any Buyer under the General Service or Limited Service rate schedules for the purchase of natural gas from Seller at delivery points on the Seller's pipeline system within the States of Indiana, Ohio and Michigan on execution of a Service Agreement in the form prescribed under this tariff for service under this rate schedule.
"2. Applicability and Character of Service
"This rate schedule shall apply to natural gas delivered by Seller to Buyer on an interruptible basis in excess of Buyer's Contract Demand. Gas sold and purchased hereunder shall be gas for resale for ultimate public consumption.
"3. Rate
"26.3 cents per M.c.f. of gas delivered during the month.
  *   *   *   *   *
"7. Procedure for Offering and Curtailing Gas Under This Rate Schedule.
"Whenever Seller has gas available for sale in excess of that necessary to meet the firm, annual, and interruptible contract volumes, which Seller has been authorized to deliver in specific dockets, it shall offer not less than 20% of such gas to Buyers which own or control storage facilities for injection into storage as a part of such Buyer's regular storage

program. The volume of gas determined to be available for storage requirements under the I schedules shall be divided among Buyers owning or controlling storage, and willing to contract for such gas, in proportion to the firm contract demands of those requesting such gas.
"Not less than one-half of the excess gas, remaining after the execution of contracts with Buyers owning or controlling storage facilities, shall be offered for contract on a non-discriminatory basis to all of its Buyers. The service agreement shall specify the maximum daily volumes for such interruptible service. All gas sold on an interruptible basis to both direct and resale customers may be interrupted at any time and in any amount in the sole discretion of Seller but only after reasonable notice to Buyers and direct customers and upon a non-discriminatory and non-preferential basis. On any day for which Seller has ordered curtailment of service, in whole or in part, under this rate schedule, all gas taken by a Buyer in excess of the reduced volume provided for under curtailment orders, shall be considered as delivered under Seller's applicable firm rate schedule." Panhandle Eastern Pipe Line Co., 1951, 10 F.P.C. 185, 215, modified, 13 F.P.C. ——.

20. See Cia Mexicana De Gas v. Federal Power Commission, 5 Cir., 1948, 167 F. 2d 804, 806.

its export to Canada inconsistent with the public interest. In considering this matter the Commission stated:

" * * * In the first place, we cannot find on this record that Michigan Consolidated has satisfactory markets for the volumes of gas it expresses a desire to purchase pursuant to the interruptible rate schedule. Of course, an essential ingredient of public convenience and necessity is adequate markets. The survey made by Michigan Consolidated of its interruptible markets was an abstract one in which the cost of other fuels appears to have been the primary concern, and possible customers were not even specifically approached as to their willingness to purchase the gas. Further, the only valid existing interruptible rate of Michigan Consolidated is 42 cents, a figure too high to permit the sale of the interruptible gas. At the same time the 35-cent per Mcf rate under which Michigan Consolidated contends that it would sell the interruptible gas does not give consideration to charges for transportation through the distribution facilities of Michigan Consolidated nor, more important, has it been considered or approved by the Michigan Public Service Commission. In addition, under the company's proposal, the gas sought by Michigan Consolidated would be used almost in its entirety for boiler fuel in displacement of coal, a matter which although not of decisive importance of itself, is deserving of consideration. Thus, separate and apart from the provisions of Section 3 governing export sales, and the circumstances surrounding Panhandle's proposal for the exportation of gas we could not on the record before us impose the condition which Michigan Consolidated seeks, requiring Panhandle to make the deliveries to it aforesaid.

"In contrast, turning again to the question of the requirements of Section 3, the circumstances we have detailed show that Panhandle's proposal to export gas is not inconsistent with the public interest. There is no boiler fuel use proposed by Panhandle and thus we are not approving a type of use for export which we do not favor for domestic purposes. Additionally, the contract for export provides for curtailment of export deliveries when such gas is needed in the United States and such export will measurably increase the over-all load factor of Panhandle. On balance, we find that the record in this case would not support a finding that the proposed exportation is inconsistent with the public interest. It is appropriate to observe that, in the language of the Examiner although in a somewhat different context, 'it is consistent with the public interest for gas to be exported to our neighbor and ally, Canada'; and it is consistent also with the policies of cooperation and joint endeavor which have for so long characterized the relations of this nation and Canada not only in matters of defense, but also in matters relating to our respective economies, that the proposed increased deliveries to Union as requested by Panhandle be authorized."

These findings are supported by substantial evidence and the conclusions thus stated are clearly within the special competence of the Commission. We conclude that Michigan Consolidated has failed to show reversible error in those portions of the order of the Commission which it has asked us to review.

Paragraphs (B), (H) and (I) of the order of the Federal Power Commission issued June 30, 1956 will be affirmed.

McLAUGHLIN, Circuit Judge, concurs in the result.