MICHIGAN CONSOLIDATED GAS COM-
PANY, a corporation, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company, Michigan Gas Utilities Company et al., Central Illinois Light Company, Michigan Gas Storage Company, City of Indianapolis, Indiana, Northern Indiana Fuel & Light Co., Southeastern Michigan Gas Co., Citizens Gas Fuel Company, Missouri Power & Light Company, Missouri Public Service Company, Central Illinois Public Service Company, Illinois Power Company, Illinois Commerce Commission, Missouri Public Service Commission, Public Service Commission of Indiana, Indiana Gas & Water Company, Inc., Intervenors.

MICHIGAN WISCONSIN PIPE LINE
COMPANY, a corporation,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company, Missouri Public Service Company, Central Illinois Public Service Company, Intervenors.

AMERICAN LOUISIANA PIPE LINE
COMPANY, a corporation,
Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company, Missouri Public Service Company, Central Illinois Public Service Company, Intervenors.

COUNTY OF WAYNE, MICHIGAN, a
municipal corporation and body
politic, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

MILWAUKEE GAS LIGHT COMPANY,
a corporation, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

WISCONSIN FUEL AND LIGHT COM-
PANY et al., Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

NATURAL GAS DISTRIBUTORS, INC.,
a corporation, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

STATE OF WISCONSIN and Public Service Commission of Wisconsin,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

CITY OF DETROIT, MICH., a municipal
corporation, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

Panhandle Eastern Pipe Line Company,
Intervenor.

WISCONSIN PUBLIC SERVICE CORPO-
RATION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company,
Intervenor.

MICHIGAN CONSOLIDATED GAS COM-
PANY, a corporation, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent,

Panhandle Eastern Pipe Line Company, Central Illinois Light Company, Michi-

gan Gas Utilities Company, Battle Creek Gas Company, Michigan Gas Storage Company, Missouri Power & Light Company, Missouri Public Service Company, Illinois Power Company, Illinois Commerce Commission, Missouri Public Service Commission, Indiana Gas & Water Company, Inc., Intervenors.

Nos. 14975–14977, 15061, 15065, 15070, 15073, 15074, 15077, 15093, 15144.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 1, 1959.

Decided April 29, 1960.

Petitions for Rehearing Denied
July 11, 1960.

Mr. Charles V. Shannon, Washington, D. C., with whom Messrs. Stanley M. Morley and Richard F. Generelly, Washington, D. C., were on the brief, for petitioners in Nos. 14975, 14976, 14977, and 15144, argued for all petitioners.

Mr. Leonard Simons, Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of Court, with whom Mr. Mitchell J. Cooper, Washington, D. C., was on the brief, for petitioner in No. 15061.

Mr. Glen H. Bell, Madison, Wis., with whom Messrs. Charles P. Seibold, Madison, Wis., and George Bunn, Washington, D. C., were on the brief, for petitioners in No. 15070.

Mr. William E. Torkelson, Madison, Wis., for petitioners in No. 15074.

Mr. J. Parker Connor, Washington, D. C., with whom Messrs. Charles S. Rhyne and Lenox G. Cooper, Washington, D. C., were on the brief, for petitioner in No. 15077.

Mr. Seymour Tabin, Chicago, Ill., with whom Mr. Julius Tabin, Chicago, Ill., was on the brief, for petitioner in No. 15093.

Mr. Robert L. Russell, Asst. Gen. Council, Federal Power Commission, with whom Messrs. Willard W. Gatchell, General Counsel, Federal Power Commission, and Howard E. Wahrenbrock, Solicitor, Federal Power Commission, were on the brief, for respondent.

Mr. Raymond N. Shibley, Washington, D. C., with whom Mr. Richard P. Taylor, Washington, D. C., was on the brief, for intervenor Panhandle Eastern Pipe Line Company.

Mr. J. W. McAuliffe, Detroit, Mich., of the bar of the Supreme Court of Michigan, pro hac vice, by special leave of Court, with whom Mr. Thomas J. Lynch, Washington, D. C., was on the brief, for intervenors Battle Creek Gas Company, Michigan Gas Utilities Company, Northern Indiana Fuel & Light Company, and Southeastern Michigan Gas Company in No. 14975.

Mr. Patrick J. Smith, Indianapolis, Ind., of the bar of the Supreme Court of Indiana, pro hac vice, by special leave of Court, with whom Mr. John H. Pratt, Washington, D. C., was on the brief, for intervenor City of Indianapolis, Indiana in No. 14975.

Mr. H. R. Begley, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Mr. Earle W. Wallick, Washington, D. C., was on the brief, for intervenor Illinois Commerce Commission in Nos. 14975 and 15144.

Messrs. Vernon A. Swanson, Milwaukee, Wis., and George P. Lamb, Washington, D. C., were on the brief for petitioner in No. 15065.

Mr. John Wattawa, Washington, D. C., was on the brief for petitioner in No. 15073.

Mr. John T. Miller, Jr., Washington, D. C., was on the brief for intervenor Citizens Gas Fuel Company in No. 14975.

Mr. Bradford Ross, Washington, D. C., entered an appearance for intervenor Central Illinois Light Company in Nos. 14975 and 15144.

Mr. Edwin Robbins and Lawrence A. Baker, New York City, entered appearances for intervenor Michigan Gas Storage Company in Nos. 14975 and 15144.

Mr. Robert E. Losch, Washington, D. C., entered an appearance for intervenor Missouri Power & Light Company in Nos. 14975 and 15144.

Messrs. Charles E. McGee and Francis H. Caskin, Washington, D. C., entered

appearances for intervenor Missouri Public Service Company in Nos. 14975, 14976, 14977 and 15144.

Mr. Moultrie Hitt, Washington, D. C., entered an appearance for intervenor Central Illinois Public Service Company in Nos. 14975, 14976 and 14977.

Mr. James D. Williams, Jr., Washington, D. C., entered an appearance for intervenor Illinois Power Company in Nos. 14975 and 15144.

Mr. Thomas J. Downey, Jefferson City, Mo., entered an appearance for intervenor Missouri Public Service Commission in Nos. 14975 and 15144.

Messrs. Donald E. VanKoughnet and Joseph H. Lesh, Washington, D. C., entered appearances for intervenor Public Service Commission of Indiana in No. 14975.

Mr. A. L. Wheeler, Washington, D. C., entered an appearance for intervenor Indiana Gas & Water Company, Inc., in Nos. 14975 and 15144.

Before BAZELON, WASHINGTON and BURGER, Circuit Judges.

1. The disputes before the courts alone are chronicled in the following fifteen cases, cited in abbreviated form:

Panhandle Eastern Pipe Line Co. v. F.P.C., 83 U.S.App.D.C. 297, 169 F.2d 881, certiorari denied, 1948, 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402; Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1949, 173 F.2d 784; Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 6 Cir., 1949, 177 F.2d 942; Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., D.C.E.D.Mich.1953, 117 F.Supp. 551; Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L. Ed. 128; Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 1951, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993; Michigan Consolidated Gas Co. v. F.P.C., 3 Cir., 1953, 203 F.2d 895; Panhandle Eastern Pipe Line Co., v. F.P.C., 3 Cir., 1953, 204 F.2d 675; Panhandle Eastern Pipe Line Co. v. F.P.C., 3 Cir., 1953, 204 F.2d 925; Panhandle Eastern Pipe Line Co. v. F.P.C., 3 Cir., 219 F.2d 729, certiorari denied 1955, 349 U.S. 945, 75 S.Ct. 874, 99 L.Ed. 1272; Michigan Consolidated

BAZELON, Circuit Judge.

This proceeding is another encounter in a long running battle between Panhandle Eastern Pipe Line Company ("Panhandle") and American Natural Gas Company ("American Natural") the dominant corporations in two of the largest natural gas systems serving the Midwest.[1] Their difficulties arose shortly after Panhandle and American Natural's subsidiary, Michigan Consolidated Gas Company ("Michigan Consolidated") entered into a contract in 1935 which, as amended, required Panhandle, an interstate natural gas transportation company, to furnish Michigan Consolidated, a local gas utility serving Detroit and environs, with 127,000 Mcf of natural gas per day.[2] The orders of the Federal Power Commission here under review, promulgated after one of the longest hearings in the history of the commission, granted Panhandle the right to abandon this service.[3]

### I. Background

The gas delivered under the 1935 agreement originally constituted Michi-

Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 1955, 226 F.2d 60, certiorari denied 1956, 350 U.S. 987, 76 S.Ct. 473, 100 L.Ed. 853; Panhandle Eastern Pipe Line Co. v. F.P.C., 3 Cir., 232 F.2d 467, certiorari denied 1956, 352 U.S. 891, 77 S.Ct. 129, 1 L.Ed.2d 86; Panhandle Eastern Pipe Line Co. v. F.P.C., 3 Cir., 1956, 236 F.2d 289; Memphis Light, Gas and Water Division v. F.P.C., 1957, 100 U.S.App.D.C. 205, 243 F.2d 628; Michigan Consolidated Gas Co. v. F.P.C., 3 Cir., 246 F.2d 904, certiorari denied, 1957, 355 U.S. 894, 78 S.Ct. 267, 2 L.Ed.2d 192.

2. Mcf is the standard abbreviation for thousand cubic feet. All volumes referred to in this opinion are on a daily basis.

3. On August 7, 1959, this court stayed the effective date of the Commission's order until after oral argument. On October 2, 1959, one day after the argument, we permitted the stay order to dissolve and the abandonment order to take effect but cautioned that these cases present "serious and substantial questions" and that the parties "act at their own risk" until final disposition of the case.

gan Consolidated's sole supply of natural gas. But Panhandle's deliveries failed to keep pace with the growth of the Detroit market and by 1945, Michigan Consolidated was forced to turn to other sources. It organized through its parent, American Natural, two interstate pipe lines—Michigan Wisconsin Pipe Line Company ("Michigan Wisconsin") and American Louisiana Pipe Line Company ("American Louisiana")—to bring gas to the Great Lakes area from Texas and Louisiana. Each of these companies now sells some gas to Michigan Consolidated for resale in the Detroit area; the balance is sold through Michigan Wisconsin to local utility companies, for resale in their respective markets.[4]

Panhandle obtains gas from both independent producers and its own large reserves in Texas, Oklahoma and Kansas. Its pipe line extends from these gas fields to northern termini in Michigan. Panhandle sells its gas in the intervening states to two main classes of customers: (1) independent local utilities (some 60 in number) who resell primarily, but not exclusively, to domestic and commercial space heating consumers; (2) industrial customers who use the gas as industrial fuel. Significantly, the sale of gas to utilities for resale is subject to the regulatory jurisdiction of the Commission; sales made directly to industrial customers are not.[5]

There are strong indications that one of Panhandle's primary purposes in seeking abandonment is to shift gas from regulated to unregulated sales. According to the Commission, "at least part of the trouble [between Panhandle and Michigan Consolidated] seems to have arisen from competition [between them] to serve industrial consumers in the Detroit area."[6] Another factor, which clearly appears from the "chronical of [their] disputes and litigation,"[7] is Panhandle's failure to enlarge its pipe line capacity to satisfy the great demand for natural gas in its market area. Many of Panhandle's resale customers are operating under severe shortages which prevent them from serving many would-be consumers. Moreover, the rising demand of their presently attached consumers has forced many of these utilities to manufacture artificial gas at a cost much greater than the price of natural gas.

Michigan Consolidated charges, and the Commission agrees, that Panhandle's failure to expand implements its deliberate aim to avoid the Commission's rate regulations.[8] Evidence of this policy is said to appear from the following: (1) Panhandle's large volume of unregulated sales to industrial and Canadian customers; (2) Panhandle's announced desire to keep its gas reserves in the ground, except insofar as they can be utilized for unregulated sales, until the rate ceilings on presently regulated sales are lifted;[9]

4. With one exception, Milwaukee Gas Company, these utilities are not affiliated with the American Natural system.

5. Natural Gas Act, § 1(b), 52 Stat. 821 (1938), 15 U.S.C.A. § 717(b); Panhandle Eastern Pipe Line Co. v. Public Service Commission of Ind., 1947, 332 U.S. 507, 68 S.Ct. 190, 92 L.Ed. 128.

6. American Louisiana Pipe Line Co., 20 F.P.C. 851, 852 (1958).

7. Ibid.

8. The Commission's brief says: "Petitioners' objections, as in previous cases, emphasize Panhandle's cumulative dissatisfaction with F.P.C. regulation of its rates, its deliberate policy not to expand its

capacity in pace with the growth of its resale markets, and its firm purpose to take its gas from under F.P.C. regulation. None of this does the Commission gainsay." Brief for Respondent, p. 2.

9. During the course of the hearings, staff counsel asked a Panhandle executive:
"* * * is it a fact that Panhandle Eastern never intends to file any expansion program until they can get a fair field price for their gas? * * * [I]sn't that what Panhandle is holding out for?"
The witness answered:
"* * * I think that it would be safe to say that Panhandle would want a commensurate rate for its company-produced gas, whether that was arrived at

and (3) Panhandle's vigorous efforts before the Commission, including the present proceedings, to divert more gas from utility to industrial customers.

The present proceeding is not Panhandle's first attempt to abandon service to Michigan Consolidated. In 1951, when their contract expired, Panhandle sought permission to reduce its deliveries. This request was denied on the ground that Michigan Consolidated needed the gas more than Panhandle's other utility customers.[10] The denial was ultimately sustained by the United States Court of Appeals for the Third Circuit in 1956.[11] Its opinion stated, however, that Panhandle would be free to renew its application for abandonment "if and when" Michigan Consolidated obtained gas from American Louisiana—the second major transportation pipe line built by Michigan Consolidated's parent, American Natural.[12]

## II. The Instant Proceedings

The present abandonment proceedings grow out of American Louisiana's application for a certificate of public convenience and necessity to construct a thirty-inch pipe line from Louisiana to Detroit. The line's capacity was to be 300,000 Mcf per day, two thirds of which American Louisiana proposed to sell to Michigan Consolidated and one third to Michigan Wisconsin.

Panhandle intervened in opposition to the project, claiming that, as a supplier for the Detroit market, it would be adversely affected by the proposed sale to Michigan Consolidated. The Commission set the American Louisiana construction application for hearing in proceedings known as "Docket G-2306" and granted a certificate.[13] Upon review in 1955 the Court of Appeals for the Third Circuit affirmed.[14] At that point there only remained the task of allocating American Louisiana's gas.

Hearings in Docket G-2306 were resumed in December of 1955 for the purpose of allocation. At these proceedings Michigan Wisconsin requested gas to meet the increased demands of the utility customers it was already serving as well as gas to supply a number of previously unserved Wisconsin communities through proposed pipe line extensions. Allocation to Michigan Wisconsin for this latter purpose was complicated, however, by the fact that Midwestern Gas Transmission Company ("Midwestern") had also filed an application to construct a pipe line to serve a number of the same new Wisconsin markets with Canadian gas. Since the Midwestern and Michigan Wisconsin construction applications were mutually exclusive, a comparative

by a fair field price method or some cost method that might be developed.

"If it got what it considered a fair value for its company-produced gas, that would certainly be influential in encouraging the management and the board of directors to consider further expansion of the company's facilities."

In City of Detroit v. Federal Power Comm., 1955, 97 U.S.App.D.C. 260, 230 F.2d 810, certiorari denied 1956, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48, this court held that Panhandle's actual cost and not the prevailing field price must be used, at least as a point of departure, in fixing rates.

10. Panhandle Eastern Pipe Line Co., 11 F.P.C. 167 (1952).

11. Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 3 Cir., 1956, 236 F.2d 289.

12. Id., at page 294.

13. American Louisiana Pipe Line Co., Opinion No. 276 (Oct. 1, 1954) (unreported).

14. Panhandle Eastern Pipe Line Co. v. Federal Power Comm., 3 Cir., 1955, 219 F.2d 729. Both the Court's and the Commission's opinions, supra note 13, pointed out that there is a "crying demand" for additional gas in the midwest area; that Panhandle had "evinced no interest" in attempting to meet this demand; and that the 200,000 Mcf of gas which American Louisiana proposed to sell to Michigan Consolidated was needed to supplement, not displace, the 127,000 Mcf supplied by Panhandle.

hearing was required to determine which proposal would best serve the public interest.

Instead of awaiting the outcome of the necessarily lengthy comparative hearing between Michigan Wisconsin and Midwestern, the Commission immediately allocated 240,115 Mcf of American Louisiana's 300,000 Mcf capacity in order to meet the requirements of Michigan Consolidated and those existing and potential Michigan Wisconsin customers which Midwestern did not propose to serve. The remaining 59,885 Mcf of American Louisiana's capacity was reserved for possible future allocation to the new Wisconsin markets. This amount, the Commission found, "safely exceeds any reasonable requirements for new markets." [15]

Before permanent allocation of its initial capacity was completed, however, American Louisiana filed an application for a certificate of public convenience to increase its capacity by 57,000 Mcf. In order to have this badly needed gas available for the winter (1956–57), the Commission issued a temporary, emergency certificate authorizing immediate construction and operation. Shortly thereafter, Panhandle intervened in opposition to American Louisiana's expansion application and simultaneously filed an application to abandon totally its deliveries to Michigan Consolidated.

The Commission thus had before it three separate applications concerning the American Natural system: (1) Michigan Wisconsin's proposal to build a pipe line to serve the new Wisconsin communities with the previously reserved 59,885 Mcf of American Louisiana's initial capacity, (2) American Louisiana's application to expand its capacity by 57,000 Mcf, and (3) Panhandle's request to abandon service to Michigan Consolidat-

ed. The Commission chose to process these three applications in two proceedings. The first was the previously ordered comparative hearing between Michigan Wisconsin and Midwestern. The second was a consolidated hearing on the American Louisiana expansion and the Panhandle abandonment.

After lengthy hearings in the expansion-abandonment case, the Examiner, in June of 1958, issued his decision, granting American Louisiana a permanent certificate for its proposed expansion, and denying Panhandle's abandonment application. He found that if the Panhandle deliveries to Michigan Consolidated were withdrawn the American Natural system would not have sufficient gas to met its customers' needs. In October the Commission affirmed the Examiner with respect to the American Louisiana expansion, but reserved decision on the abandonment application.

In the meantime, the comparative hearings between Midwestern and Michigan Wisconsin in the so-called "Mid-west omnibus" case were completed. On October 31, 1958, the Commission rejected both proposals on the grounds that they lacked economic or technical feasibility.[16] The Commission found, however, that the central Wisconsin area was still in need of gas and invited the parties to submit revised proposals. But it also noted that its earlier reservation of 59,885 Mcf of American Louisiana gas was not for all times, and did not mean that "should demands on the part of existing markets become of greater importance in the public interest the new Wisconsin markets * * * must be forever favored * * *." [17]

Six weeks later, on December 19, 1958, and without acting upon the proposals invited in the Mid-west omnibus case, the Commission issued its decision in the

15. American Louisiana Pipe Line Co., 15 F.P.C. 23, 34 (1956). The order accompanying this opinion reserved 79,690 Mcf for new markets, but subsequent orders authorizing service to communities which were non-competitive with Midwestern's application reduced the volume of reserve gas to 59,885 Mcf per day. 16 F.P.C. 897 (1956); 17 F.P.C. 300 (1957); 17 F.P.C. 657 (1957).

16. American Louisiana Pipe Line Co., 20 F.P.C. 575, 592, 604 (1958).

17. Id. at 604.

abandonment case. It authorized Panhandle to abandon totally its deliveries to Michigan Consolidated; and to replace the abandoned Panhandle service, it allocated to Michigan Consolidated both the 57,000 Mcf of American Louisiana's expanded capacity and the 59,885 Mcf of its original capacity previously reserved for new markets.[18] However, the Commission's order rejected Panhandle's proposed plan of distribution for the 127,000 Mcf of abandonment gas on the ground that it would have made some gas available to Panhandle for direct sales to industrial customers. Panhandle was therefore directed to present a new allocation plan which would "provide that the gas should be sold for resale primarily to domestic and commercial [space heating] consumers." [19]

Michigan Consolidated, its affiliates in the American Natural system, and some of their customers filed applications for rehearing. Shortly thereafter, Michigan Consolidated also submitted a settlement proposal pursuant to the Commission's rules of practice.[20] The proposal contemplated that Michigan Consolidated, which has large underground storage facilities in the Great Lakes area, would purchase the same *annual* volumes from Panhandle as at present but would do so during off-peak periods. This would allow Panhandle to use its maximum daily capacity,

including the 127,000 Mcf, to meet the peak-day demands of other customers in its market area for winter space heating.

On February 13, 1959, the Commission denied all of the applications for rehearing,[21] and refused to consider Michigan Consolidated's plan "whatever its virtues" because it was inconsistent with the Commission's order and unacceptable to Panhandle and some of its customers.[22] The Commission's order also rejected Panhandle's revised plan for allocating the abandonment gas among its resale customers because (1) it failed to show how much of the abandonment gas would be made available to space heating customers, and (2) it proposed to allocate the abandonment gas to utility customers who were less in need of gas than Michigan Consolidated. The Commission thereupon postponed the effective date of the abondonment order and set a hearing for June 16, 1959, at which "properly interested parties could present plans and evidence with respect to the disposition of Panhandle's gas * * *." But the Commission added that members of the American Natural system and their customers were not "such parties" and would thus be excluded from the hearing.[23]

These eleven consolidated petitions for review [24] challenge three related orders

18. 20 F.P.C. 851 (1958). Commissioner Kline noted that he would only allow partial abandonment. Id. at 858.

19. Ibid.

20. 18 C.F.R. § 1.18 (1949). That section establishes a prehearing procedure to expedite proceedings and to provide an opportunity for settlement. Subsection "e" provides that, "Nothing contained in this section shall be construed as precluding any party to a proceeding from submitting *at any time* offers of settlement or proposals of adjustment to all parties and to the Commission * * *." (Emphasis supplied.)

21. American Louisiana Pipe Line Co., 21 F.P.C. 218 (1959).

22. Id. at 227. Commissioner Kline concurred in the denial of a rehearing, but stated that he was still of the view that

the public interest would be better served by partial abandonment. Commissioner Connole dissented from the denial of a rehearing insofar as it precluded consideration of the settlement proposal.

23. Ibid.

24. Michigan Consolidated, its two affiliates in the American Natural System (Michigan Wisconsin and American Louisiana), three customers (two present and one potential) of Michigan Wisconsin, and three governmental units challenge the abandonment orders. In addition, the Wisconsin Public Service Corporation appeals, in No. 15093, from an order of the Commission which denied it leave to intervene in the abandonment case because its petition was filed more than thirty days after the original abandonment order. Michigan Consolidated also appeals, in No. 15144, from the Commission's denial of a

of the Commission: (1) the December 19, 1958 order authorizing the abandonment and allocating American Louisiana's gas to Michigan Consolidated; (2) the February 13, 1959 order denying rehearing, summarily rejecting the proposed settlement, and excluding the American Natural system and its customers from further proceedings involving disposition of the abandonment gas; and (3) an order, issued during the course of the hearings, affirming the Examiner's exclusion of certain evidence.

### III. The Criteria for Abandonment

1. *The statute:* Petitioners assert that the Commission rested its action on an erroneous construction of § 7(b) of the Natural Gas Act. That section provides that "No natural-gas company shall abandon all or any portion of its facilities [or service] subject to the jurisdiction of the Commission" without Commission approval based on a finding, after due hearing, either (1) that the supply of gas is depleted, or (2) that "the present or future public convenience or necessity permit such abandonment." [25] Panhandle sought and the Commission approved total abandonment solely upon a finding in accordance with the second provision.

 The fact that abandonment of public service requires Government approval symbolizes the special legal status and obligations of common carriers and public utilities. This includes an obligation, deeply embedded in the law, to continue service. When Panhandle sought and obtained a certificate of public convenience and necessity to serve the Detroit market, it became the exclusive supplier for that market. If it wants to abandon service because it must now share that market, or because it prefers to use that gas for more profitable unregulated sales, or because it wants to be rid of what it considers a vexatious servitude, these are not reasons for granting its request. Abandonment may be allowed only if the "public convenience or necessity permit." And the word "permit," instead of "require," does not shift the burden to those opposing the application. An applicant for abandonment under § 7(b) of the Act has the burden of making the factual showing which will assure the Commission, charged with protecting the public interest, that that interest will in no way be disserved; just as the applicant under § 7(c) for a certificate to commence service must bear the burden of proving that that public interest will be served. [26]

2. *The Commission's rationale:* Our responsibility for determining whether the Commission properly concluded that the public interest would not be jeopardized by abandonment is hampered at the outset. For the Commission's opinions in this case are not models of clarity as to the standards it applied in determining that the "public convenience and necessity permit such abandonment." In its original opinion the Commission said:

"An appropriate standard is set forth in our [previous] Opinion * * * denying partial abandonment where we said that Panhandle had 'made no showing that the needs of the consuming public served by these other customers for natural gas are *greater than, or as great as,* the needs of the consuming public in

---

rehearing of its February 13 order which denied rehearing of the abandonment order. Michigan Consolidated apparently feared that its exclusion from the further proceedings which the Commission ordered to determine a plan of allocation for the abandonment gas might be construed as a substantive order, and it sought rehearing in order to preserve its right to judicial review under § 19(b) of the Natural Gas Act, 52 Stat. 831

(1938), as amended, 15 U.S.C.A. § 717r (b).

Panhandle, eleven of its customers, three state commissions and a municipality all intervened in support of the Commission.

25. 52 Stat. 824 (1938), 15 U.S.C.A. § 717f (b).

26. See *Atlantic Refining Co. v. Public Service Comm.*, 1959, 360 U.S. 378, 391, 79 S.Ct. 1246, 3 L.Ed.2d 1312.

the areas served by Michigan Consolidated and Michigan Wisconsin in the event of the cutback at Detroit' or no showing 'of benefits to the consuming public along the Panhandle system * * * which would offset the injury and damage to the consuming public * * *' served by the other systems." [27]

The Commission's starting point in applying this "appropriate standard" was its finding that "There is sufficient gas available from the capacity of American Louisiana's pipeline that has not been permanently allocated * * * to permit abandonment without depriving Michigan Consolidated or the American Natural System of gas allocated to them other than on a temporary basis." [28] This conclusion was based, in part, on statistics showing that, even without Panhandle, the American Natural system had enough (but barely enough) gas on an annual basis to meet the past demands of its presently attached loads.[29] The Commission nonetheless recognized that "the record contains extensive testimony on the needs of both the American Natural * * * [and] Panhandle [systems] for additional supplies of gas. An objective way to approach this problem," said the Commission, "is to compare the heating saturation of * * * Michigan Consolidated * * * with the heating saturations of other customers of Panhandle * * *." [30] Finding that

fewer Panhandle customers heated with gas, it ordered the abandonment.

On rehearing the Commission appears to have shifted its ground. It declared that under the statute, "abandonment will be permitted unless *inconsistent* with the public convenience and necessity."[31] In reaching this conclusion, said the Commission, "the standards mentioned here and in our previous order were but partial criteria used in reaching a result within the language of the statute."[32] Utilizing this broadened test, the Commission recognized the relevance of at least two factors militating against abandonment—the added costs to Michigan Consolidated and the unconsidered needs of Michigan Wisconsin customers. But it concluded that "whatever detriments there may [be] to Michigan Consolidated * * * and Michigan Wisconsin * * * consumers," they were outweighed by the "great demands for service on Panhandle's system." [33] Panhandle's greater need was further demonstrated by a comparison of each system's ability to supply its customers on days of maximum demand. Finally the Commission averted to the advantages of separating the two systems as another factor supporting abandonment.[34]

■ Although the Commission's rationale is not altogether clear to us, we are able to glean from its opinions three ultimate determinations upon which it rested the abandonment and allocation orders: (1) that the gas supply in ques-

27. 20 F.P.C. 851, 854, quoting from Panhandle Eastern Pipe Line Co., 11 F.P.C. 167, 171–72 (1952). Emphasis supplied.

28. 20 F.P.C. at 854.

29. The Commission found that American Natural's annual requirements utilize 262,278,160 Mcf and its latest annual capacity to be 260,595,197 Mcf. "This," said the Commission, "is close enough * * * so that the difference can be made up by [added compression]." Id. at 856.

30. Id. at 857. Heating saturation is defined at note 38 infra.

31. 21 F.P.C. at 221.

32. 21 F.P.C. at 220.

33. 21 F.P.C. at 221.

34. In its parting shot, the Commission summed up thus:
"In applying the standard of the Act all of the considerations referred to in this order and in our prior order were weighed. Certainly the needs of Panhandle's customers for the gas coupled with the general considerations expressed in our previous order and again referred to below with respect to the relations between the two systems and their place in the natural gas industry show that the public convenience and necessity 'permit' such abandonment." [21 F.P.C. at 222]

tion could be used "to greater advantage" by Panhandle's customers than by the customers of American Natural;[35] (2) "that each system will more efficiently procure gas supplies and serve its own customers if separated from the other one;"[36] and (3) that there was sufficient unallocated gas on the American Natural system to replace the supply which Michigan Consolidated would lose by the abandonment order.

If valid, these determinations are sufficient to establish that "the present or future convenience and necessity permits * * * abandonment."[37] Petitioners contend, however, that these determinations are fatally defective. We shall discuss their objections to each.

### IV. The Finding of "Greater Need"

Recognizing that the demand for gas in both the American Natural and Panhandle market areas far exceeded the available supplies, the Commission made three comparisons in order to determine which system could utilize the gas to better advantage. We shall refer to them as the "heating saturation" test, the "capacity-demand ratio," and "the considerations of economic burden."

1. *Comparative space heating saturations:* This test, upon which the Commission relied most heavily, purported to assess relative need by determining the percentage of existing residential and commercial consumers on each system who use gas for space heating purposes. This percentage is called the "space heating saturation."[38] Applying its formula

to the facts in the record, the Commission found that, in 1958, 54.67 percent of Michigan Consolidated's residential and commercial consumers utilized natural gas for space heating, while only 50.4 percent of comparable Panhandle consumers bought gas for that purpose. (The remaining customers presumably utilized gas only for cooking, hot water and similar purposes). The Commission concluded from this disparity that Panhandle had the greater need.

█ Petitioners' first objection to the heating saturation test is that the Commission adopted an erroneous basis of comparison. They contend that in computing Panhandle's average saturation, the Commission should not have included the very low saturation (16 percent) of one customer that is primarily interested in reselling to industrial, as distinguished from space heating, consumers, and that the Commission should not have excluded from the computation the high saturations of two other Panhandle customers on the ground that they had another source of supply. Since the purpose of the comparison was to determine relative needs among those who might obtain the gas, and since the Commission stated that it would not allocate any of the abandonment gas to the two customers with high saturations and an alternate supply, we think their saturations were properly eliminated. Conversely, the saturation of the customer with only a 16 percent saturation was properly included since it might have been allocated gas on the condition that it be resold to non-industrial users.

35. Despite some language to the contrary, we find that the Commission actually relied upon its finding that the gas could be used to *greater* advantage on the Panhandle system. Hence it is unnecessary for us to consider petitioners' argument that the Commission misconstrued the statute by suggesting that the public interest would "permit" abandonment if the needs of Panhandle's consumers were only *as great as* the needs of Michigan Consolidated's.

36. 21 F.P.C. at 227.

37. We do not decide whether these determinations are also sufficient to support the allocation of American Louisiana's uncommitted capacity to Michigan Consolidated. Petitioners have not raised the applicability of §§ 7(c) and (e), and we do not reach the question.

38. "By dividing the number of heating customers by the total number of residential and commercial customers, a percentage figure is obtained which represents heating saturation." 20 F.P.C. at 857. According to this test, the lower the percentage saturation, the greater the need.

Petitioners' second allegation of erroneous comparison, however, is well taken. As they point out, the Commission originally announced that "appropriate standard" for determining whether the public interest permitted abandonment required a comparison of the needs of "the consuming public along the Panhandle system" with "the needs of the consuming public in the areas served by Michigan Consolidated *and Michigan Wisconsin.*" [39] In implementing this standard, however, the Commission actually compared the Panhandle saturation with that of Michigan Consolidated alone. When this inconsistency was called to its attention, the Commission, in its opinion denying rehearing, stated:

"Also relevant, but not controlling, is the need for additional gas on the systems of Michigan Wisconsin's distributors, some of whom have comparatively low space heating saturations. While we have carefully considered the problems of these companies, the space heating saturation of Michigan Consolidated, which is being directly deprived of the Panhandle gas and the advantages of separating the two systems have greater weight." [21 F.P.C. 218, 221.]

■■ We think that the Commission erred in excluding the Michigan Wisconsin distributors from the space heating saturation test. It is clear that "If the requirements of the public interest are to be satisfied, the Commission must consider not only the public benefit * * but also any public loss * * *." Democrat Printing Co. v. Federal Communications Commission, 1952, 91 U.S. App.D.C. 72, 75, 202 F.2d 298, 301. As the Commission itself recognized in the first abandonment case:

"Panhandle says that it has no obligation to the public served by distributors supplied by the Michigan-Wisconsin pipeline other than Michigan Consolidated. But the consid-erations of the public convenience and necessity in testing the abandonment are not restricted to that portion of the public living in Detroit, and include, certainly, the impact on other areas as well." [Panhandle Eastern Pipe Line Company, 11 F.P.C. 167, 169 (1952)]

Viewed realistically, abandonment has a substantial "impact" upon consumers in the areas served by Michigan Wisconsin's utility customers. It is these distributors who are actually being deprived of gas as a result of abandonment, for under the Commission's orders Michigan Consolidated is a conduit through which the unallocated gas on the American Natural system flows to Panhandle's customers. This is so because Michigan Consolidated is ultimately not deprived of any gas. Its entire loss is to be replaced with the American Louisiana unallocated capacity. True, Michigan Consolidated might well have obtained some of the replacement gas, even if abandonment had been denied, but it is equally clear that significant quantities would still have been left for use by Michigan Wisconsin's existing, if not potential, customers. The interest of these customers in attaching new loads and meeting other future demands while "not controlling" should have been fairly reflected in the space heating saturation figures by which the Commission measured the impact of abandonment on the American Natural system. This is required for at least two reasons: (1) by using the unallocated gas to replace Michigan Consolidated's lost supply, the Commission has made Michigan Wisconsin's and Panhandle's use of this gas, as a matter of economic fact, mutually exclusive, Delta Airlines, Inc. v. C. A. B., 1955, 97 U.S. App.D.C. 46, 51, 228 F.2d 17, 22; and (2) if the unallocated American Natural gas is used to replace Michigan Consolidated's loss, the future needs of the Michigan Wisconsin consumers must be met by expensive expansion on the American Natural system. City of Pittsburgh v.

Federal Power Comm., 1957, 99 U.S.App. D.C. 113, 237 F.2d 741.

Although the Commission concedes that the gas needs of these Michigan Wisconsin customers are "relevant," it failed to say how much an appropriate weighing of these Michigan Wisconsin saturations would reduce the Michigan Consolidated saturation of 54.67 percent. The record shows that the space heating saturations of Michigan Wisconsin's existing customers in Wisconsin ranged from a low of 27 percent to a high of 44 percent. The average was 35 percent. Thus, a sizeable market for attaching new loads existed. Since Panhandle's saturation of 50.4 percent is only 4.27 percent less than Michigan Consolidated's, even some weight to the Michigan Wisconsin figures might well have indicated a contrary result.[40]

We are not unmindful that one of the two reasons the Commission gave for excluding Michigan Wisconsin's saturations from its comparison formula is that Michigan Consolidated was being "directly deprived of the gas." But in the circumstances of this case we think that a distinction between "direct" and indirect" deprivation is without a difference. Such a distinction might have been relevant if Michigan Consolidated's loss to

Panhandle were not replaced and the effect of abandonment were to reduce the level of service to Michigan Consolidated's presently attached customers. Although abandonment without replacement would have deteriorated Michigan Wisconsin's competitive claim for new gas on the American Natural system to the extent that it aggravated Michigan Consolidated's need for new gas, no existing Michigan Wisconsin consumers would have been cut off.

■ But instead of considering the abandonment separately from the allocation of the free American Natural gas, the Commission chose to treat them together, and clearly indicated that it predicated the abandonment upon the availability of replacement gas. In this situation neither Michigan Consolidated nor Michigan Wisconsin were required to detach existing loads. Since each of them will feel the effect of the Commission's action only with respect to future demands for new service, Michigan Wisconsin's interest has not been shown to be less "direct" than Michigan Consolidated's (or the Panhandle resale customers'). It follows that Michigan Wisconsin's interest in attaching new loads to meet the demands of prospective customers was entitled to some demonstrable weight.[41]

---

**40.** The Commission argues in its brief that, with the denial of American Louisiana's application in the Midwest omnibus case to serve the new Wisconsin communities, Michigan Wisconsin lost its claim to any of the 59,885 Mcf of gas originally earmarked for its market. Furthermore only 55 percent of the 57,000 Mcf of "expansion gas" (or roughly 29,000 Mcf) had been temporarily allocated to Michigan Wisconsin, with the possibility that an even smaller amount might be permanently certificated. From this, the brief concludes that this 29,000 Mcf, which equals only 22 percent of the 127,000 Mcf which Panhandle attempted to abandon, would "plainly not warrant the use of Michigan Wisconsin's saturation for comparison at anything like equal weight of that of Michigan Consolidated * * *." (Brief for Respondent at 32.) Even assuming the premises of this argument to be correct, the short answer is that the Commission gave these Michigan Wis-

consin saturations no weight, or at least failed to tell how an appropriate weighing would affect Michigan Consolidated saturation.

**41.** It is elementary that the ruling of an administrative agency cannot stand if the conclusion or an ultimate fact does not follow rationally from subsidiary facts. Johnston Broadcasting Co. v. Federal Communications Comm., 1949, 85 U.S. App.D.C. 40, 46, 175 F.2d 351, 357; Capital Transit Co. v. Public Utilities Comm., 93 U.S.App.D.C. 194, 205, 213 F.2d 176, 187, certiorari denied 1954, 348 U.S. 816, 75 S.Ct. 25, 99 L.Ed. 643; Tri-State Broadcasting Co. v. Federal Communications Comm., 1938, 68 App. D.C. 292, 295, 96 F.2d 564, 567.

As the text indicates, we do not think that the determination that the gas can be used to greater advantage on the Panhandle system than by Michigan Consolidated and the Michigan Wisconsin

Petitioners' final objection with respect to the saturation test is this: even if the comparison were otherwise valid, a comparison of "unsifted averages" did not and could not show *how much* abandonment was necessary to equalize distribution. Consequently they contend that the Commission erred in ordering *total* abandonment based upon a system-wide comparison of average heating saturations rather than first determining which of Panhandle's customers would receive the abandonment gas and in what amounts. They point out that some of Panhandle's other customers have far higher saturations than Michigan Consolidated, and some lower, and that, under the Commission's stated objective of fairly distributing natural gas, the abandonment gas will presumably be allocated only to Panhandle customers having lower saturations than Michigan Consolidated. Petitioners urge that the volume of gas necessary for such allocations may require only partial rather than total abandonment, and therefore the Commission cannot validly order total abandonment until these allocations are actually made. They also contend the Commission compounded its error by excluding them from the proceedings which it ordered to determine a suitable plan for allocating the abandonment gas among Panhandle's other customers.

▇▇▇ We do not say that the Commission may never rest total abandonment on a comparison of needs based on system-wide averages rather than individual communities. But we do think that it cannot do so without a satisfac-tory explanation of the circumstances which were thought to require or justify it. The need for such an explanation is particularly pressing where, as here, a gas supply which would ordinarily have been available to certain communities is allocated to other communities in order to facilitate an abandonment and these deprived communities are not afforded an opportunity to show that such allocation does not constitute fair distribution.

2. *The capacity-demand ratios:* The Commission's second test of relative needs measured the ability of each system to meet the peak-day demands of its customers. The Commission found that American Natural was able to supply 96 percent of the gas consumed on its system on a peak day; Panhandle only 83.5 percent.[42] Petitioners contend that this comparison rests on two errors: (1) the capacity of Panhandle was derived from evidence in another proceeding to which Michigan Consolidated was not a party;[43] and (2) the demands of some of Panhandle's customers were based on evidence in the current proceeding not subjected to cross-examination since it was introduced by Panhandle for "information only," with an express disclaimer of reliance upon it "for any purpose."[44] They therefore claim they were denied due process in that they had no opportunity to contradict the evidence upon which the comparison was based. Ohio Bell Telephone Co. v. Public Utilities Comm., 1937, 301 U.S. 292, 300–301, 57 S.Ct. 724, 81 L.Ed. 1093. They also point out that the Commission invoked this comparison for the first time in its

customers flows rationally from a finding that Panhandle's customers need it more than Michigan Consolidated alone.

42. These figures are obtained by dividing the maximum daily deliveries which each system can make from its transportation and storage facilities by the total amount of gas consumed on the system during a peak day. The deficit between consumption and supply is presumably met by manufactured gas, which is generally more costly than natural gas.

43. Town Gas Co., 19 F.P.C. 143 (1958). This case, in turn, relied upon evidence concerning Panhandle's capacity which was introduced in still another proceeding.

44. The figures in question were submitted to Panhandle in response to a questionnaire it had sent to each of its resale customers. Panhandle's counsel said that the purpose of the exhibit was merely to show what "the customers estimated their requirements would be." The Hearing Examiner stated that the questionnaires would be received "for informational purposes" and he did not "think the Commission would use them as a basis for allocation of gas."

opinion denying rehearing, thereby depriving them of a constitutional right to present their objections. Morgan v. United States, 1938, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

Because the capacity-demand test was advanced after the Commission's original decision, it would appear that the Commission did not view it as a ground which would alone support the finding of greater need. Hence, even if this comparison were unassailable, a remand is required by our holding that the space heating comparison is fatally defective. In the proceedings on remand, the Commission will necessarily have an opportunity to consider petitioners' objections to the capacity-demand comparison. We therefore refrain from passing on petitioners' objections to allow initial consideration by the Commission.

3. *Considerations of economic burden*: Some of the petitioners raise another objection to the Commission's finding that the public served by Panhandle can make more effective use of the gas than Michigan Consolidated. They point out that, due to Panhandle's depreciated rate base, its gas is cheaper, and that the American Natural replacement gas will cost consumers in the Detroit area over four million dollars more per year. But in its opinions, the Commission considered this increased cost to Detroit consumers against the even greater cost which Panhandle customers would incur by the use of expensive manufactured gas to meet their shortages.

We cannot say its consideration was improper.

## V. The Availability of Replacement Gas

The second ultimate determination upon which the Commission based its order is that there is sufficient unallocated gas on the American Natural system to replace the 127,000 Mcf of abandonment gas. This volume was to come from three sources: "expansion" gas, "overpumpage" gas, and "reserve" gas. Petitioners vigorously assert that none of this gas can be used as replacement.

1. *The expansion gas:* This refers to the 57,000 Mcf resulting from the first-step expansion of American Louisiana's pipe line. Petitioners claim that the issuance of emergency, and later the permanent, certificates of public convenience authorizing expansion were predicated, at least in part, upon Commission determinations that Michigan Wisconsin's existing utility customers urgently needed this expansion gas.[45] From this they conclude that it cannot all be allocated to Michigan Consolidated. We agree that there is an inconsistency between certificating an expansion on the ground that it is needed by one market, and then permanently allocating the fruits of that expansion to another market. But we do not think this was beyond the authority of the Commission providing that it found, upon a valid comparison, that other markets were in *greater* need of the gas. The difficulty is, as we found earlier, that the Commission's comparison was not valid since it failed to accord proper consideration

---

45. In its expansion application, American Louisiana proposed to sell the gas to Michigan Consolidated and to Michigan Wisconsin for resale to its existing utility customers. The Commission ordered that this gas be temporarily apportioned 55 percent to Michigan Wisconsin and 45 percent to Michigan Consolidated.

Under the Act the Commission may issue a certificate without notice or hearings "in cases of emergency, to assure maintenance of adequate service or to serve particular customers." Natural Gas Act § 7(c), 52 Stat. 824 (1938), 15

U.S.C.A. § 717f(c). But the Commission has no authority to issue a temporary certificate to serve new markets. Algonquin Gas Transmission Co. v. Federal Power Comm., 1 Cir., 1953, 201 F. 2d 334.

A permanent certificate requires a finding, *inter alia*, of adequate markets. The Commission, in granting the permanent certificate, found an unsatisfied demand on the American Natural System, including Michigan Wisconsin's existing customers 20 F.P.C. at 479.

to the needs of Michigan Wisconsin's customers. Hence the determination of where this gas is needed most must await a proper comparison in further proceedings on remand.

2. *The overpumpage gas:* This refers to gas which the Commission suggested would be available on the American Natural system if American Louisiana operated its "spare" compressors full time and continually obtained gas from the fields at maximum contract demands. There is some conflict in the testimony as to the prudence of this procedure in terms of safety and the adequacy of gas reserves. And it is not altogether clear that American Louisiana's contracts with its suppliers allow it to take its maximum volumes on a permanent basis. But we cannot say upon the record before us that the Commission's action was arbitrary or unsupported by substantial evidence.[46]

3. *The reserve gas:* This refers to the 59,885 Mcf of American Louisiana's initial capacity, originally reserved in Docket G–2306 for distribution to new Wisconsin markets in the event that Michigan Wisconsin prevailed in the Mid-west omnibus case. The expansion-abandonment hearings proceeded on the assumption that the reserve gas was available for allocation only in Docket G–2306.[47] By the time the Commission rejected Michigan Wisconsin's proposal to serve the new communities, the expansion-abandonment hearings had terminated and the Examiner had rendered his report denying abandonment. Thereafter, the Commission took the gas reserved in Docket G–2306, and allocated it in these expansion-abandonment proceedings.

Petitioners urge that this violates the Ashbacker rule[48] and elemental principles of procedural due process in two respects: (1) Those petitioners who were seeking gas for new markets and intervened only in Docket G–2306 suddenly found that the gas which had been reserved for disposition in those proceedings had been allocated in the abandonment case without notice to them or opportunity to be heard. (2) Other peti-

---

46. The virtual direction to American Louisiana to expand should be compared to the Commission's flat denial that it had authority to force Panhandle to expand. The relevant statutory provision is § 7(a) of the Natural Gas Act, 52 Stat. 824 (1938), 15 U.S.C.A. § 717f(a), which authorizes the Commission after a proper hearing to "direct a natural-gas company to extend or improve its transportation facilities * * * if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities * *."

 Relying on the proviso to this section, the Commission repeatedly asserts in its brief that it is "powerless to compel Panhandle to expand [its pipe line or storage facilities] in order to serve [the public need for gas on its system]." Brief for Respondent, pp. 2, 29. The Commission recognizes that "the existence of a more desirable alternative is one of the factors which enters into a determination of whether a particular proposal would serve the public convenience" and that the Commission's impotence "to command the alternative does not mean that it cannot reject the proposal." City of Pittsburgh v. Federal Power Comm., 1956, 99 U.S.App.D.C. 113, 123, note 28, 237 F.2d 741, 751, note 28. But it says to do that would be "to cut off its nose to spite its face." Brief for Respondent, p. 29.

 Without deciding this question, we merely note that the Commission's lack of authority to command an improvement or extension of facilities may not be so clearcut as it suggests. Compare Michigan Consolidated Gas Co. v. Panhandle Pipe Line Co., 6 Cir., 1949, 173 F.2d 784; with Panhandle Pipe Line Co. v. Federal Power Comm., 3 Cir., 1953, 204 F.2d 675; Michigan Consolidated Gas Co. v. Federal Power Comm., 3 Cir., 1957, 246 F.2d 904; Central West Utility Co. v. Federal Power Comm., 3 Cir., 1957, 247 F.2d 306.

47. The Presiding Examiner expressly stated in his opinion that "The Commission has earmarked this [reserve] gas. * * * [Its] disposition * * * is not in issue here."

48. Ashbacker Radio Corp. v. Federal Communications Comm., 1945, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108.

tioners who had intervened only in these expansion - abandonment proceedings (mostly Michigan Wisconsin's existing customers seeking the expansion gas for their markets in Michigan and Wisconsin) were effectively precluded from asserting any claim to the reserve gas in any forum because they did not, and could not reasonably, anticipate that gas reserved for disposition in another proceeding would be allocated in this one *after* the hearing in this proceeding had terminated.

Although these contentions raise serious questions,[49] we need not decide them since the alleged lack of notice and hearing will perforce be remedied by the comparisons already required by this opinion on remand to the Commission.[50]

In such proceedings, the Commission will, of course, be free to consider the extent to which needs of any of the communities requesting gas service from Michigan Wisconsin have been met or are likely to be met by other natural gas pipe lines.[51]

## VI. The Advantages of Total Separation

We come now to the last of the three basic determinations upon which the Commission predicated its order.

The Commission's opinions make it abundantly clear that it considered total separation of these warring giants a major benefit [52] and relied upon it as an element of the public interest supporting abandonment.[53]

49. See, e. g., Delta Airlines, Inc. v. Civil Aeronautics Board, 1955, 97 U.S.App. D.C. 46, 51, 228 F.2d 17, 22; Delta Airlines, Inc. v. Civil Aeronautics Board, D.C.Cir.1959, 275 F.2d 632.

50. Since we are remanding the case for further proceedings, we shall dismiss the petition of Wisconsin Public Service Corp., No. 15093, without prejudice, and without deciding whether petitioner was entitled to judicial review under § 19(a) of the Natural Gas Act, notwithstanding its tardy petition for rehearing. 52 Stat. 831, 15 U.S.C.A. § 717r(a). See note 24, supra.

51. Panhandle has argued that any injury which the petitioners representing new markets may have sustained, as a result of the Commission's decision to allocate the reserve gas in the abandonment case, is now moot, for these same communities will shortly obtain Canadian gas from another supplier. After argument we invited the parties to submit supplemental briefs on this issue. It appears that on October 31, 1959 the Commission approved a combined Midwestern-Michigan Wisconsin application to serve the same Wisconsin communities as Michigan Wisconsin originally proposed to serve with the reserve gas. But petitioners contend that, despite Commission approval, the project may not reach completion as it requires the approval of Canadian authorities to export the gas, and financing at favorable rates. Conversely, petitioners urge us to notice that Panhandle has filed an application for a rate increase which, if approved, will provide it with the incentive to expand enormously its present capacity.

We express no opinion on the relevance of either of these proposals. Upon the remand we order, the Commission will be at liberty to consider what effect, if any, these and other proposals in various stages of fruition may have upon whether the public interest permits Panhandle's abandonment.

52. The Commission mentioned these benefits in the concluding passages of both its original and rehearing opinions: "Moreover, with the separation for which we are providing both Panhandle and Michigan Consolidated should be in a stronger and in an independent position." 20 F.P.C. at 858. "[I]t is our opinion that each system will more efficiently procure gas supplies and serve its own customers if separated from the other one." 21 F.P.C. at 227.

53. At the point in its rehearing opinion where it disclaimed reliance upon a single standard, the commission said:
"In applying the standard of the Act all of the considerations referred to in this order and in our prior order were weighed. Certainly the needs of Panhandle's customers for the gas coupled with the general considerations expressed in our previous order and again referred to below *with respect to the relations between the two systems and their place in the natural gas industry* show that the public convenience and necessity 'permit' such abandonment." [21 F.P.C. at 222 (emphasis supplied)]
In discussing the proper weight to give the space heating saturations of Michigan Wisconsin's customers, it stated:
"While we have carefully considered the problems of these companies, the space

It is not clear, however, what the Commission thought these benefits were. The Commission said several times in its opinions that total separation would make each system more "efficient" and "stronger." But it failed to make clear whether this efficiency and strength would be achieved by the termination of controversy or from some other consequence of total abandonment.

Petitioners argue that it was the termination of controversy upon which the Commission relied. They contend that this was improper because the Commission affirmed the Examiner's exclusion of evidence relating to the origins of and reasons for the controversy, saying:

"* * * we are fully aware of the fact that there is a long history of controversy between the parties, but *we find nothing in the Act setting forth the existence of controversy as a basis for permitting natural gas service to be abandoned.* If such a basis could be found in the law, the issue herein would have long since been resolved." [54]

Assuming, as petitioners argue, that the Commission relied upon the termination of controversy as a ground for ordering total abandonment, we cannot

agree that the exclusion of this evidence necessarily precluded the Commission from such reliance. The Commission could nonetheless find a proper basis for its action in its great knowledge of the controversies, derived from the mountains of records amassed by these antagonists over many years in previous cases before it. Based upon this experience, it might know, for example, whether the expenses and delays of litigation and the other social costs of the controversy have adversely affected quality and cost of service to the ultimate consumer. Such information is, of course, relevant to the question of whether the public convenience permits abandonment. Similarly, it may have an expert's knowledge that does not require evidence in the record that each system will be more efficient and stronger after abandonment.

But we think that, in these circumstances, the Commission cannot invoke particular knowledge, sight unseen, under the cloak of past experience. Instead it must reveal what this knowledge is and how it supports the conclusion for which it is invoked. Since it is by no means clear from this record that (1) abandonment will terminate the series of controversies between the parties [55]

---

heating saturation of Michigan Consolidated, which is being directly deprived of the Panhandle gas *and the advantages of separating the two systems* have greater weight." [21 F.P.C. at 221 (emphasis supplied)]

Finally, in the section of its rehearing opinion, entitled "Conclusions on Rehearing," the Commission said:

"It may be true, as contended, that we have never before permitted an abandonment of service over the protests of the buyer, but here we have a peculiar situation where one of two great rival natural gas systems is required to serve the other. This situation has been subject to our regulatory authority for some time as indicated in our prior order. Up to the present time because of shortage of gas supplies we have been unwilling to permit the abandonment. Now because of American Louisiana's increased capacity and the availability of the gas reserved in Docket No. G–2306, et al. abandonment has become feasible * * *. [21 F.P.C. at 226–27]

Commissioner Kline also understands the Commission to rely heavily upon the advantages of separating the American Natural and Panhandle systems. In his concurring opinion on rehearing, where he explains why he favors only partial abandonment, he says: "The majority are of the view that the benefits which will accrue to the public by reason of the complete severance of relations between the two systems outweigh other aspects of the public interest." 21 F.P.C. at 228.

54. American Louisiana Pipe Line Co., 18 F.P.C. 571, 572 (1957). Emphasis supplied.

55. As petitioners point out, there is much evidence which suggests that separation will not terminate the controversies. The Commissioner tells us that: "At least part of the trouble seems to have arisen from competition to serve industrial consumers in the Detroit area." Yet Panhandle's application to abandon service candidly states that it intends to continue its efforts to capture industrial customers

or (2) that "each system would more efficiently procure gas supplies and serve its own customers if separated from the other one," the Commission's action cannot be sustained on this ground. Federal Communications Comm. v. RCA Communications, 1953, 346 U.S. 86, 96–97, 73 S.Ct. 998, 97 L.Ed. 1470.

### VII. Settlement Proposal

We think the Commission also erred in its treatment of the settlement proposal filed by Michigan Consolidated and that the Commission must reconsider the matter upon the remand of this case.

 This proposal was filed after the original abandonment order was issued, but before the petitions for rehearing were denied. Under this proposal the full 127,000 Mcf of abandonment gas would be available to Panhandle during the winter months to satisfy space heating needs of its domestic and commercial customers. In summer months, however, Panhandle would be required to continue its sales to Michigan Consolidated, and, indeed, to step up its rate of delivery so that the same annual volume would be supplied. Michigan Consolidated offered to store this summer gas in its large underground fields in order to have it available to meet the winter space heating needs of *its* domestic and commercial customers. Michigan Consolidated further charges that neither Panhandle nor its utility customers are presently capable of storing this volume of off-peak gas, so that it will either be sold directly to industrial customers (which Panhandle favors) or will remain in the field (which would mean that Panhandle's pipe line was not being used to capacity all year round). The Commission did not pass upon these charges, however, for it refused to consider the settlement

proposal "whatever its merits," and excluded American Natural and its customers from the post-abandonment allocation proceedings.

Even assuming that under the Commission's rules Panhandle's rejection of the settlement rendered the proposal ineffective *as a settlement*, it could not, and we believe should not, have precluded the Commission from considering the proposal *on its merits*. Indeed, the proposal appears prima facie to have merit enough to have required the Commission at some stage of the proceeding to consider it on its own initiative as an alternative to total abandonment.[56] The consuming public with which the Commission is concerned—residential and commercial space heating users—require large uninterruptible supplies during the winter months, but little or no gas during the other months. The settlement proposal promises to fulfill the Commission's announced objectives of distributing gas to this consuming public on the basis of need, even more fully than total abandonment.

Of course, there may be valid objections to the settlement proposal which the Commission has not explained, or which a hearing upon the proposal would reveal. Such considerations may merit modification or total rejection of the proposal. But we think that, since the Commission is charged with the duty of protecting the ultimate consumer from "exploitation at the hands of natural gas companies," Federal Power Comm. v. Hope Natural Gas, 1944, 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333, it cannot refuse *to consider* a proposal which appears, on its face at least, consistent with that duty.

The Commission's orders will be set aside and the case remanded for further

in the Detroit area. See Panhandle Eastern Pipe Line Co. v. Michigan Public Utilities Comm., 1951, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993.

56. Federal Communications Comm. v. Pottsville Broadcasting Co., 1940, 309 U.S. 134, 138, 60 S.Ct. 437, 84 L.Ed. 656; City of Pittsburgh v. Federal Power Comm., 1956, 99 U.S.App.D.C. 113, 123 note 28, 237 F.2d 741, 751 note 28. See also Clarksburg Publishing Co. v. Federal Communications Comm., 1955, 96 U.S.App.D.C. 211, 225 F.2d 511; Mansfield Journal Co. v. Federal Communications Comm., 1950, 86 U.S.App.D.C. 102, 180 F.2d 28.

proceedings not inconsistent with this opinion.

### On Petition of Federal Power Commission for Modification of Opinion and Rehearing

 In its petition for rehearing in banc, which has been denied today by the court in banc, Panhandle argues that the Commission's action in rejecting Michigan Consolidated's settlement proposal was beyond this court's jurisdiction to review because the proposal was not included in a timely application for rehearing. The division of this court which heard this case deems it appropriate to comment upon this contention.

Panhandle's argument rests upon § 19 of the Natural Gas Act. Subsection (a) provides that "any person * * * aggrieved by an order issued by the Commission * * * may apply for a rehearing within thirty days after the issuance of such order." And subsection (b) provides that "No objection to the order of the Commission shall be considered by the court [of appeals] unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 52 Stat. 831 (1938), 15 U.S.C.A. § 717r. See Federal Power Commission v. Colorado Interstate Gas Co., 1958, 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583.

On December 18, 1958, the Commission overruled the trial examiner's decision denying Panhandle's application and ordered total abandonment. Michigan Consolidated filed its settlement proposal on January 23, 1959—five days beyond the thirty-day period prescribed by § 19(a). We point out, however, that under the Commission's own regulations "any party [may submit] at any time offers of settlement or proposals of adjustment to all parties and to the Commission * * *." 18 C.F.R. § 1.18 (1949). We think this may be construed to authorize the Commission to consider such filings *at any time* while the case is in its bosom. Quite evidently the Commission did so construe it, for the Commission did not reject the filing of Michigan Consolidated's offer on the ground that the proposal was not included in a timely petition for rehearing. Instead, rejection was based on the ground that the offer was inconsistent with the Commission's order and unacceptable to Panhandle and some of its customers. This refusal was included in the Commission's opinion of February 23, 1959, denying rehearing. Within thirty days thereafter, Michigan Consolidated filed a petition for rehearing, seeking reconsideration of the Commission's action with respect to the settlement offer. The Commission rejected that petition by letter dated March 19, 1959;[1] Michigan Consolidated appealed from that action in No. 15144;[2] and the Commission conceded in its separate brief in that case that "petitioner properly invokes this court's jurisdiction under Section 19 of the Natural Gas Act."

The Commission, in its instant petition for modification or rehearing, makes no direct attack upon this court's jurisdiction, but it bitterly assails the court for "a clear intrusion into the area of the

---

1. The letter stated that the petition was rejected because the Commission's order of February 13, 1959, had "discussed the proposal of Michigan Consolidated Gas Company without reaching any determination. Hence [the] application is not addressed to any affirmative action on the part of the Commission * * *." While it is true that the Commission entered no formal findings or orders concerning the proposal, it clearly rejected it. Since the denial was administrative action which finally and adversely determined an important legal question, we think petitioner was entitled to petition for rehearing and to appeal. 52 Stat. 831 (1938), 15 U.S.C.A. § 717r. Cf. Sun Oil Co. v. Federal Power Comm., 5 Cir., 1959, 266 F.2d 222, affirmed, 364 U.S. 170, 80 S.Ct. 1388; Sunray Mid-Continent Oil Co. v. Federal Power Comm., 364 U.S. 137, 80 S.Ct. 1405; Algonquin Gas Transmission Co. v. Federal Power Comm., 1 Cir., 1953, 201 F.2d 334.

2. That appeal was consolidated with the others from the Commission's earlier orders.

Commission's exclusive responsibility." It complains that it is:

"sheer madness to say that one of the contending companies could lie back with an alternative proposal until after the clock has struck, and then, wholly without warrant in the governing statutes or rules, ambush the Commission and force it to enter into another, new comparative hearing."

We are not persuaded by this and other such hyperbolic assertions by the Commission. We still think that in the special circumstances of this case, the Commission erred in brushing aside the settlement proposal on the grounds that it was unacceptable to Panhandle and inconsistent with the abandonment order. The proposal contained no surprises. The Commission knew, or should have known, from its files and records that Panhandle's resale customers could not use all of the abandonment gas during the summer months, and that Michigan Consolidated had fields in which it could store summer deliveries. These matters, on their face, reflected the basis for an alternative to total abandonment, so apparently in the public interest, that their consideration at some point in the proceedings was indispensable to the validity of any public interest determination in support of total abandonment. In viewing the public interest, the Commission's vision is not to be limited to the horizons of the private parties to the proceeding.[3]

Where, as here, a regulatory agency has ignored factors which are relevant to the public interest, the scope of judicial review is sufficiently broad to order their consideration. These limits are not to be confused with the narrower ones governing review of an agency's conclusions reached upon proper consideration of the relevant factors.

The petition is denied.

---

**3.** See authorities cited in note 56 of the opinion.